## THE PEOPLE *vs.* HENRY G. GREEN.

On a trial for murder, the dying declarations of the deceased, that is, declarations made under the apprehension of death, are competent evidence against the prisoner; but before such declarations are received, it must be satisfactorily proved that the deceased, at the time of making them, was conscious of the danger and had given up all hope of recovery.

Where, by the direction of the attending physician, and in his presence, W. informed the deceased on the day before her death, that she could not live, whereupon the deceased requested the physician to hear a communication that she desired to make, and with his consent she proceeded to give a history of the conduct of the prisoner during her illness, tending to show that he had several times during such illness, administered arsenic to her, held that snch communication was admissible, as her dying declaration.

Where, on the trial of a capital case, several witnesses are to be examined to the same point, the court may in its discretion require all such witnesses, except the one under examination, to leave the room, during such examination.

The possession by a prisoner of an unanswered letter, found in his pocket, at the time of his arrest, is not, of itself, evidence of the contents, and it can not be read in evidence against him on the trial.

The maxim, *qui tacet consentire videtur* is not applicable to such a case; nor is it generally applicable, except to verbal conversations and to certai. communications in writing in mercantile transactions. It can not be app. d to facts stated in a letter which a party is not bound, or interested to ans r.

Where a party has called a witness, and proved by him a conversation 'ad with the opposite party, the party whose conversation has been proved c n not, on cross-examination, prove by the witness a subsequent conversation between the party cross-examining and the witness, which took place two or three hours after the first conversation, though such subsequent conversation was upon the same subject as the first conversation and in explanation of it.

And though the party calling the witness prove the fact that there was a subsequent conversation, that does not entitle the party cross-examining the witness to prove what was said at such subsequent conversation.

What facts must be established to convict on the trial of an indictment for murder—the distinction between positive and circumstantial evidence and the comparative reliability of each—the reasons for proving and the character and value of dying declarations — the question of motive, — and the cases in which the accused may avail himself of a previous good character—stated and discussed in the charge.

Form of a warrant of execution (note *a*).

The prisoner, Henry G. Green, was indicted for the murder of Mary A. Green, his wife, by poisoning her with arsenic, and pleaded to the indictment not guilty. The cause came on to be tried at the Rensselaer oyer and terminer, on the 7th July, 1845, before Parker, circuit judge, and Davis, Bull and Waite, county judges. The trial occupied two weeks, the evidence relied upon by the prosecution being mostly circumstantial. About fifty witnesses were examined.

It was proved on the trial, that the prisoner was married to the deceased on Sunday the 10th February, 1845: that both the prisoner and the deceased were about 22 years of age; that on the Friday next after the marriage, the deceased was taken ill and died on the Monday following.

Most of the circumstances which it is necessary to understand, for the purpose of presenting the questions of law decided on the trial, are sufficiently stated in the charge of the court.

Evidence was introduced on the part of the prosecution for the purpose of laying a foundation for proof of the dying declarations of the deceased

Emerson Hull, a physician, who attended her in her last illness, testified that on Sunday afternoon, about 6 o'clock, he had come to the conclusion that her prospect of recovering was entirely hopeless; that her brother, David W. Wyatt, inquired of him what he thought of her case, and he replied he thought she could not live through the night, and that they had better communicate it to his sister; that Wyatt did communicate it to her. He said to her in substance, " Mary, the Doctor thinks you can't live," or words to that effect, and she answered, "Must I die and not see my mother?" That some little time afterwards, Mr. Wyatt said to the witness, " My sister wants to make a communication to you, before she dies," and witness then returned with Wyatt to the chamber where she was, took a chair and sat down by her bed, and told her he understood she wanted to make a communication to him. She said she did.

David W. Wyatt corroborated this statement of Doct. Hull, and testified that his sister asked the witness if the doctor had given her up; that witness told her they had; that she then said there was something she wished to say to Doct. Hull, and witness went immediately and called him.

The counsel for the prosecution here offered to prove what the deceased said to Doct. Hull, in the absence of the prisoner, on the ground that what she said was her dying declarations.

The counsel for the prisoner objected to this evidence, 1. Because such declarations were inadmissible, and 2. That a proper foundation had not been laid, and that it did not sufficiently appear that the deceased expected immediate death, and cited 1 *Cow. & Hill's Notes,* 611, note 457: *M'Nally Ev.* 386.

The court decided that it had been satisfactorily proved that the deceased was conscious of her danger and had given up all hope of recovery, and that the case was therefore brought within one of the exceptions to the rule excluding hearsay evidence, and the court overruled the objection and received the evidence, to which the counsel for the prisoner excepted.

Before taking the evidence, the court, at the request of the prisoner's counsel, required all the witnesses, who were to be

examined as to the dying declarations of the deceased, to leave the room during the examination, on that subject, of Doct. Hull. The court held that such requirement was entirely a matter of discretion in the court, to be exercised according to the circumstances of each case, in such manner as should seem best adapted to the furtherance of justice. The court expressed the opinion that this was a proper case for the separation of the witnesses, and, under the directions of the court, all the witnesses on this branch of the case left the room during the examination of Doct. Hull.

Doct. Hull then testified to the dying declarations as follows: The deceased said, that after taking the pills that Henry gave her on Friday, she had been in great distress; that it seemed sometimes as though she could not live. She said, " I had such a burning heat through me, that it seemed as if I could not live a minute. She said, Henry has been *feeding* me with white powder **ever** since I took those pills. He has put it into almost every thing he has given me; he has put it into my coffee and into my broth and almost all my drinks. Yesterday I asked him for some wine and water. He got some, turned his back toward me, took a paper out of his pocket, and dusted something into it which was white; he gave it to me; I asked him what it was he put into it, and he said a little flour I dusted in it. I drank it and it distressed me very much." At this time she appeared to be worried, and I remarked to her that her communication was of such a nature, that I would be glad if she would com- municate it to some other person. She said she would endeavor to. I then called on Mr. Barzaleel Streeter, and asked if he would consent to sit by and hear her communication. He said he would, and took a chair and sat down by the bed, and I remained in the room. I could not understand what she said to Mr. Streeter. She was very feeble at that time, and spoke in a low whisper. Her mind was unimpaired as far as I could judge; remarkably so. An exception was taken by the pri soner's counsel to the admission of this evidence.

The prisoner's counsel then called Barzaleel Streeter, who testified on this point as follows: On Sunday evening Mrs.

The People v. Green.

Green made a communication to me. Doct. Hull proposed it. She said to me, " I am dying, and wish to communicate to you what I have seen and heard, before I die." She said Henry offered her pills on Friday and she refused to take them. She said, " I did not consider my ill health serious and thought it not proper to take pills; he urged them upon me and told me they would make me feel better. I took them. Such a feeling as those pills made me have I never experienced before; I became numb all over; my eyelids drawed down and I could not keep them apart; I began to vomit terribly, with a terrible feeling at my stomach, the most deathly feeling I ever experienced. * * * After that Henry brought me a powder; I saw him take something from his vest pocket and put into it; after he offered it to me I asked him what he put in. He said, ' nothing but a little flour.' He brought me some drink afterwards; a white substance appeared in it. I asked him what it was. He said, " A little soda.' " The witness then stated that Mrs. Green, at this point, had become very weak, and said she must rest; could not tell me any thing more then, but would after resting; that she never resumed the communication to the witness. All this evidence was also objected to, for the reasons before stated, and an exception taken by the prisoner's counsel to its admission.

David W. Wyatt, the brother of the deceased, was also examined to the same point. His evidence was objected to by the prisoner's counsel, for the reasons before stated, and also on the additional ground that such dying declarations, if admissible at all, must be confined to the cause of her death. The court received the evidence, and the prisoner's counsel excepted.

The witness testified that after the communication was made by the deceased to B. Streeter, and about 12 o'clock at night on Sunday night, she made a communication to him. The witness then related what she told him about the pills and their effect upon her, as stated by Doct. Hull and Mr. Streeter, and then added: She said, Henry administered to her a powder a number of times; that he had mixed powder with the doctor's medicine, in almost every thing that he had given her    She

said, she had found that every thing he had given her distressed her, and she thought she would take notice how he prepared the broth he gave her, on Sunday morning. She said, he took a paper from his pocket (putting her hand to her side), and put something in it and put the paper back into his pocket. When he came to the bed with it, she asked him what he put in it. He said he put a little flour in it I asked her why she drinked it. She said she could not believe he meant to poison her, and she drank a part of it. That after she found how sick it made her, she refused to take anything he prepared.

Witness also stated, that just before this conversation, she said she was poisoned to death, and that it was repeated a number of times during the night. That about 3 o'clock she said, " He has poisoned me to death." I asked who, and she said " Henry." She died about 10 o'clock next morning, and witness was with her till a few minutes before she died. It was proved, on the part of the prisoner, by Porter G. Dennison, that on Monday morning, about 6 o'clock, her brother asked her if she knew what made her so sick, and she said, " Oh! no; there is one that does know, and he knows all things."

It was proved on the part of the prosecution, that when the prisoner was arrested, there was found, in his pocket, a letter from his mother. The counsel for the prosecution then produced and offered to prove and read in evidence the following letter:

TROY, Feb. 20th, 1845.

" DEAR SON—It is with the greatest anxiety that I write to you at this time. I feel to mourn with you at this time, if weeping would do any good, but my head has been so hot that I can't shed a tear to-day. I am almost distracted that they will prove you are guilty. If that should be the case I am undone and so are you and all the rest of the family. Henry, tell me, are you innocent? and don't deceive me. Henry, I have been sorry that I have told you the reports that I heard, that I could weep night and day. I did wrong in telling them to you at all, as I did not think it would make you dislike your wife at all, —as you told me you loved her and married her for love. If

The People *v.* Green.

so, how could you wish to do so very wrong. If you had been deceived in any way, you could have left her in an honorable way. You told me she was a virtuous girl and I have believed you. And I have been sorry that I told you any hearsay reports, as I don't believe them at all. If this should be the cause of any thing that has happened, I shall weep night and day as I did not wish to make you unhappy at all. Will you forgive me, and will God forgive me. Oh, I ask it in solemn prayer to-night. As the case will soon be decided, be careful what you say and do, for your life depends on it. I want to see you very much indeed. Write to me once and let me know the whole matter. As soon as you get this—without delay—do it. Let no one see this, on no account. I remain your sincere friend and mother, till death me part. Good bye till we meet again.                                    SALLY GREEN.

HENRY G. GREEN."

In support of the admissibility of the evidence, the Attorney General cited 1 *Green. Ev.* § 198; 2 *Starkie Rep.* 123; 3 *Carr. & Payne,* 103; 5 *ib* 75; *Russ & Ryan Cr. Cases,* 264.

After hearing argument and examining the letter, the court said it was well settled that the maxim, *qui tacet consentire videtur,* was applicable to verbal conversations, where there was a statement made in a party's presence, which was not denied by him. In such case the party had an opportunity to deny the statement at once, and not doing so, there was good reason for supposing he could not controvert it. The maxim had also been applied, as between the parties, to certain mercantile dealings, as where an account current was sent to the party by letter, and no objection made to it within a given time, established by convenience or by commercial usage (1 *Cow. & Hill's Notes,* 194, and cases there cited). But it could not, in principle, be applicable to facts stated in a letter which the party was not bound, nor interested, to answer. It would be placing a man entirely at the mercy of others, if he was to be bound by what others chose to assert, in addressing letters to him. In no sense, could his silence be considered an admission of such

facts.  On the trial of *Horne Tooke* (25 *State Trials*, 130), Ch J. Eyre said, that letters found in the defendant's possession were producible and *prima facie* evidence; but he admitted their effect would very much depend upon the circumstance whether answers to them could be traced, and whether any thing had been done upon them.  For a general rule, this is too broadly stated.  I concede that there may be cases where such evidence is admissible, as where the letter is the foundation to explain some subsequent and consequent action on the part of the accused, or to enable the jury to understand the answer made to the letter, or where the letter is from a person proved to be a coconspirator (2 *Starkie Rep.* 123).  But it can not be applicable to any case where the letter only tends to support a charge of guilt in regard to a past transaction, and where it has been followed by no action and no response on the part of the person receiving the letter.  In *Rex* v. *Plumer* (*Russ. & Ry. Cr. Cas.* 264), it was held, that though a letter found on a prisoner may be read, it is no evidence of the facts it states.  There was reason for reading the letter in that case, which does not exist in this case, for the prisoner, a postoffice clerk, was on trial for stealing a bill of exchange from the letter in question, and the letter was not addressed to the prisoner but to a third person. In *Fairlee* v. *Denton* (3 *Carr. & Payne*, 103), Lord *Tenterden* said, " What is said to a man before his face, he is in some degree called on to contradict, if he does not acquiesce in it; but the not answering a letter is quite different; and it is too much to say that a man, by not answering a letter at all events, admits the truth of the statements it contains.  I am of opinion this letter can not be read."  The opinion seems now to be established, as stated by Greenleaf in his note 3 to sec. 198, that the possession of unanswered letters is not, of itself, evidence of the contents.  See also 2 *Hall Rep.* 40; *Cow. & Hill Notes*, 191, 195, and cases there cited.

The court then decided that the letter could not be read in evidence, and excluded the testimony, to which decision the counsel for the people excepted.

At a later stage of the trial the counsel for the prosecution

The People *v.* Green.

proved by Richard Rose, the jailor, a conversation he had with the prisoner, after relating which the witness stated, that some two or three hours afterwards he conversed with the prisoner again. On his cross-examination, the prisoner's counsel offered to prove by the witness what the prisoner said at such subsequent conversation, on the same subject as at the first conversation and in explanation of it; but it was objected to by the counsel for the prosecution. The court decided, that the prisoner could not prove his own declarations made in his own behalf at a different time from that inquired into on the other side; and that the proving by the prosecution of the fact of a subsequent conversation, without proving anything said at that time, did not entitle the prisoner to prove what he said upon that occasion.

The court excluded the evidence, and the prisoner's counsel excepted.

The jury were addressed by

*Job Pierson* and

*Joshua A. Spencer*, for the Prisoner, and by

*M. I. Townsend* (District Attorney) and

*John Van Buren* (Attorney General) for the People.

PARKER, J., in charging the jury, after speaking with commendation of the patient attention with which the jury had listened to the trial, proceeded, in substance, as follows:

To all concerned, the case is one of importance. To the prisoner at the bar it is most certainly one of vast importance —for his life hangs on the issue. To the public it is of infinitely great importance—because the good order of community depends on the prompt and faithful administration of justice, and the punishment of crime, where crime is proved to have been committed. It is of no less importance to you, who are acting in the discharge of a duty which you have solemnly engaged to perform faithfully, and according to the evidence. And for the manner in which you discharge that duty you will be held hereafter to a just accountability to your own consciences and to God.

The People *v.* Green.

I repeat, the patience with which you have listened to this long trial, and to the arguments of counsel, satisfy me that you do feel the importance of the considerations I have suggested, and that you will endeavor to do your whole duty. This is a case certainly of a most extraordinary character. In examining the cases of capital crimes recorded in the books, there is nothing to be found precisely of this character—nor is there any thing like it in the experience of any connected with the courts. A young man just entering on 'ife—scarcely twenty-two years of age—connected with some of the most respectable families in the county, stands indicted not only for the highest crime known to our laws, but for the murd of his wife—and that, too, of a wife to whom he had been married but a very few days.

I have spoken of the standing of the prisoner's friends, and much has been said, by counsel on both sides, on this subject— and appeals have been made to you on both sides, based on this circumstance. The standing of these friends should have no influence on your opinions one way or the other. It must matter nothing to you whether the prisoner is a humble and friendless man, or whether worthy and wealthy citizens are standing by him, to secure to him all the rights and all the favor that are to be had in such a case. All persons are to be dealt with equally and justly by you. The public look to this court for a faithful and just administration of the law—and for an honest, upright, pure discharge of the duties devolved upon it. All classes of community, whether of high or low degree, are equally concerned in the faithful and honest administration of the laws. Unless the fountain of justice be pure, those who have acquired wealth by their industry can not be protected in the enjoyment of their acquisitions; and the humble citizen can look no where but to the integrity of the courts for protection against the power and influence of those above him. I am confident you will enter on the discharge of the great duty devolving on you, by excluding from your minds all considerations, whether urged on one side or the other, connected with the standing of the prisoner or his friends. They

should not influence your verdict in any,—the slightest particular.

The proof in this case shows—and I speak of facts which are not contradicted—that early last winter the prisoner at the bar became acquainted with the deceased—that a few weeks afterwards they were married—that on the Tuesday following the marriage he brought his wife to Berlin, the place of his residence. That on Friday she was taken ill—that on Saturday a physician was called, and that on Monday morning she died. These leading facts are not contradicted—and it becomes therefore unnecessary that I should call you attention more minutely to the testimony in regard to them.

To find the prisoner guilty of the crime charged against him, certain other facts must be established beyond a reasonable doubt It must be shown not only that the person charged to have been murdered is dead—and the fact is not disputed, but that she came to her death by poison administered with a design to effect her death. And a further and more important fact must be shown. You must be satisfied that that was the act of the prisoner at the bar. These stern facts must be established beyond a reasonable doubt, before you can say the prisoner is guilty. When they are so established, you have no alternative but to pronounce your verdict accordingly.

Was Mrs. Green poisoned? And did she die of poison? Per haps I may properly remark that that fact seems now to be hardly contradicted. The proof is that when Doct. Hull was called in on Saturday, her symptoms were those of poison. He prescribed, however, for another disease. Her symptoms continued, throughout, the same. And the proof is that the body was opened after death—the stomach and adjoining parts of the æsophagus and duodenum were taken out and brought to this city, examined by chemists and physicians and properly subjected to the usual tests to ascertain the presence of arsenic. There were found in the stomach and about it, some six grains of arsenic. It is conceded that four and a half grains will produce death; and though no recorded case is found where life has been destroyed by less than that quantity, yet physicians

hold that a less quantity 'will produce death.   You have heard the opinion of these physicians, and the comments of counsel thereon.   They assign, and they could ascertain, no other cause for the death of Mrs. Green.   There was arsenic enough found in the stomach to have caused her death.   And this fact, taken in connection with the symptoms, renders it hardly worth while to consider it a controverted point.

If then she came to her death by poison, the next and far the most important question to be settled is, was it administered with a design to take her life, and was that the act of the prisoner? Did he commit the murder? Did he designedly administer the arsenic that caused her death? And this fact must be satisfactorily and reasonably established to authorize a conviction.

It is true, as claimed on the part of the prisoner, that the evidence adduced in support of this part of the case is circumstantial.   If a person witnesses the very act of taking life, and swears he saw it, that would be direct and positive evidence. But in all cases where no one witnesses the commission of a murder, but where it is inferred from circumstances, it is called circumstantial evidence, and in such case, it is on such evidence that a jury convict, if they convict at all.

Much has been said of the nature of circumstantial evidence, and of the credit that ought to be given to it.   When a witness appears before you and swears that he saw the fatal blow struck, or the act done which deprives another of life, the only question left is, does he swear to the truth? Does he commit perjury, or is he mistaken in regard to the circumstance named? When evidence is circumstantial, it may be in some cases more satisfactory than positive evidence.   As, for instance, when a circumstance is proved by many witnesses, or where similar circumstances, tending to the same point, are proved by different witnesses, or when circumstances are shown beyond all doubt, which lead necessarily to one conclusion and are irreconcilable with any other, they may be more satisfactory than direct or positive testimony.   In both cases, it is possible that injustice may be done.   From the nature of human tribunals, whether the evidence be positive or circumstantial, in all cases there is

a possibility, a bare possibility, that perjury may be committed. But in all these cases, you are bound to take the evidence as true that is given by the witnesses, whether positive or circumstantial, if there be nothing in the case to shake their credibility, or to authorize you to doubt the statement made, especially when the statements concur to support each other, and where there is no contradiction between them. Because a jury can not arbitrarily discard testimony, whether positive or circumstantial. In both cases you should scrutinize the evidence, and see whether there is any reason to believe that the witness swears falsely or is mistaken; and when the facts are established beyond all question, you are to see to what inferences they necessarily lead your minds.

In examining the evidence as to the point whether the prisoner is proved to have committed the act charged, it is claimed on the part of the prosecution, and the counsel insist that they have proved, that he had arsenic—that he had it in his possession at the time. It was proved that there was arsenic at Denniston & Streeter's store. It is shown who had possession of the key and who were in there on Sunday; that one of the owners of the store, on going in, that afternoon, found the jar of arsenic out of its place and the cover partly removed. He tells you that, about four o'clock that afternoon, the prisoner came to him and got the key to get oats for his horse—that he was gone a few moments and returned with the oats. It is claimed by the prosecution, that there is enough in these circumstances to lead your minds to the conclusion, that the prisoner (who was the last person in the store before the owner went in at five) must have taken arsenic from the jar. It is claimed also on the part of the prosecution, that originally there were nine or ten papers of arsenic in the jar, and that this number was reduced to seven when the investigation by the coroner was had, and that one paper only had been sold; and that this is a circumstance, in connection with the other mentioned, to show that one of the papers was taken by the prisoner. Now, doubtless, this is evidence of considerable importance, though by no means controlling. If it be satisfactorily estab-

lished that he took arsenic from the store on Sunday afternoon, that would not account for the use of it by the prisoner before: and much, if not all the evil that was done was by arsenic administered before that time. But it is claimed on the part of the prisoner, that the missing papers were sold previously; and two witnesses have sworn that sometime in the fall or winter they purchased arsenic at this store—each one paper. And the question is, whether the papers purchased were purchased before the nine or ten papers came into the hands of Denniston & Streeter. They tell you they purchased it on the 16th of December last: and it is for you to say, from the evidence on both sides, whether the papers sold were sold before or after the 16th of December.

But, as I before said, I by no means regard this as a controlling circumstance in the case, whether the fact be established or not, that the prisoner took arsenic on Sunday from this store. For if no other be traced to his possession before Sunday, the arsenic claimed to have been administered on Saturday, and on Friday in the pills, is not accounted for. There is other evidence that the prisoner had possession of arsenic before Sunday. I allude to the testimony of Mr. Daniel B. Green. On Friday or Saturday before the death of this woman, Mr. Green had a conversation in a bar room with the prisoner, in which conversation he admitted that he had arsenic. This, certainly, is important evidence in the case. For if you are satisfied that the prisoner had the means of committing the crime charged, it is one step towards the establishing of his guilt.

It is further claimed by the prosecution, that the prisoner administered arsenic to the deceased, and there are very many circumstances tending to establish that point. And I do not intend, on the present occasion, to call your attention minutely to this mass of evidence, because the counsel on both sides have examined it more or less closely and have presented it to you in all its bearings. It is all fresh in your recollection. It is my duty, however, to call attention to the leading points in it, to state the issues involved in the trial, and which must have an important influence in bringing your minds to a conclusion;

and to submit the case to you under suggestions merely of that character.    But to a few of these circumstances it is my duty to advert.

The proof is, that Doct. Hull was called in on Saturday. One circumstance occurred at that time which has been the subject of some comment, and that is, that when Doct. Hull recommended warm water, to rinse the stomach of the sick woman, the prisoner objected.    Now it has been urged on one side that this objection was made from motives of humanity— from a belief that she had vomited enough, and that it should be checked rather than provoked.    But it is urged on the other side, and with considerable force, that if the warm water had been administered, as Doct. Hull recommended, the deceased might throw up some of the poison which it is claimed the prisoner had previously given her, and thus not only betray the cause of her illness, but relieve the stomach, and perhaps save her life.    You, gentlemen, must pass on this evidence—you must say what inferences are to be drawn from it—and come to some satisfactory result as to the motive of the prisoner in objecting to the warm water at that time.

. Another circumstance urged by the prosecution, is, that on Saturday afternoon the prisoner came down stairs with a tumbler two-thirds full of water and a white powder in it, or rather at the bottom of it.    He said it was soda, and asked for some salæratus to put in it, for his wife.    The salæratus was put into the tumbler, and he then went into the hall, and was gone long enough to have gone to his wife's room, and to have administered it, and then came down to dinner.    It is claimed on the part of the prosecution, that the white powder in the tumbler, before the salæratus was added, was arsenic; that he needed some pretence to cover up or disguise the arsenic, and therefore applied for salæratus.    Because, it is urged, there could be no propriety, and it can scarcely be supposed the prisoner believed there was any, in mixing two alkalis—salæratus and soda.    You, gentlemen, must judge of this circumstance, and give to it such weight as you think it entitled to

Again, it is claimed that on the same Saturday in the after-

noon, Dr. Hull having forbidden the deceased to take drinks within an hour at least, the prisoner, within a quarter of an hour of the time when this injunction was given, prepared something white in a tumbler and gave it to his wife, and she drank it. And it is said the prisoner was present when Dr. Hull prohibited drinks as stated. It is claimed by the prosecution, that this was arsenic, and being administered in a liquid against the doctor's instructions was proof that the prisoner was not governed by honest motives in doing the act in question. But you, gentlemen, must judge what weight is to be given to this circumstance.

Again, on the part of the prosecution, it is claimed that on the same night, or during the night — the time I believe has been fixed at about one o'clock, Mrs. Whitford, who had been watching with the deceased, had been out half an hour, and on her return to the sick room Mrs. Green, the deceased, said to her that the prisoner, during her absence, had administered to her a powder, and that she, knowing that the doctor had left two powders, but had not directed them to be given, looked upon the table and found both powders still there. And it is urged further, by the prosecution, that this powder, thus administered without directions from the physician, was not one of the powders left by him, and that in no way consistently with the prisoner's innocence can it be shown why he administered it. And it is claimed by the prosecution that this too was arsenic.

In regard to this statement of the deceased, I should say to you that it was not made as her dying declaration. It is not therefore of itself evidence, unless said in the hearing of the prisoner. In that case it would be evidence.

Now the proof is that the prisoner was then on a bed in the same room, the situation of which has been described to you; and if you are satisfied from the evidence that he heard what was said on Mrs. Whitford's coming into the room, then it would be evidence. If not, it is barely a statement of the deceased and is not evidence.

It is claimed also by the prosecution that soon after this

occurrence, he offered her some crust coffee, which she refused to take; that on the same Saturday night the prisoner sat by the fire stirring some soup in a bowl, and mixing white lumps that appeared on the surface; and doubtless here we have important evidence. It appears some chicken broth had been prepared for her; that it was taken to her room in the evening, and had been administered to the deceased. And the proof is introduced by the prosecution that on that night Mrs. Whitford saw the prisoner by the fire with some of this broth, stirring it with a spoon and mixing what appeared to be white lumps in it, mashing them against the side of the bowl. It is claimed on the part of the prosecution that that was arsenic. If it was, then it partakes much of the character of direct evidence. It is claimed by the prosecution that the soup in the bowl thus stirred must have been administered to the deceased, because in the morning very little of it was left in the bowl, except a sediment having a white curdled appearance, which was taken out, analyzed and found to be arsenic.

It is also claimed by the prosecution — and this is important evidence — that on this night, after this preparation of the soup, Mrs. Whitford, who was watching with the deceased, during a short absence of the prisoner from the room, at the suggestion of Mrs. Green, searched to see what she could find; that she found a spoon lying on the table, having in it a powder, a white powder, extending half the length of the bowl of the spoon; that she preserved it in a paper, and it is claimed that this same powder, thus preserved, upon analysis was found to be arsenic. Doubtless this is most important evidence. Because, it is claimed that no one but the prisoner would have brought arsenic there; that all the witnesses called, and all who assisted and attended the deceased, swear they had no arsenic and brought none there. The physicians state that there was nothing of the kind in the medicine they left; and therefore it is urged with force, that the fact that the arsenic was found in the bowl, after the soup was prepared by the prisoner with the white powder — he only, his sick wife and Mrs. Whitford being in the room — furnishes

strong evidence against him that he used it and left it there in the spoon, and that this is strong evidence of his guilt.

On the same night, it is claimed, and the prosecution have proved by Mr. Hull and Mrs. Whitford, that the crust coffee had on it a white powder. This alone would be of much less importance. It is only by taking all the circumstances together that they carry with them the weight as claimed for them by the prosecution. Mrs. Whitford also states that on the same night she saw the prisoner stirring something in a tea cup, and that at the same time there was a white powder on it in lumps. These are the principal circumstances that occurred on Saturday afternoon and night.

Some things occurred on Sunday worthy of note. Mrs. Whitford and Mrs. Brimmer swear that on Sunday morning the white curdled substance found in the bottom of the bowl in which the soup was, was taken out and preserved. It was analyzed and found to be arsenic. And perhaps I should say that on the part of the prisoner, a very minute examination has been gone into, to ascertain if this powder could have been changed. Here were two different papers of powders taken by two different persons — one from the spoon and the other from the soup bowl — both of which were delivered to the coroner, by him delivered to the chemist, and by him analyzed and found to be arsenic. The attempt has been made on the part of the prisoner to show that it had been changed. It is for you to say whether there is any probability whatever that such a transaction could have happened.

On Sunday at 10 o'clock, or about that time, it is proved by Mrs. Hull, Mrs. Brimmer and Mrs. Streeter, that the prisoner offered the deceased some red drops in a teaspoon, and that there was white powder in the spoon. They state that they asked him what medicine it was, and he made no reply. That on Sunday afternoon, after the prisoner had been to the store of Denniston & Streeter to get the oats for his horse, Mr. Wyatt, the brother of the deceased, came into the sick room and found the prisoner mixing white powder in a tumbler of

water; that he offered it to his wife and she refused to take it, and at Wyatt's special request the prisoner left him to take charge of Mrs. Green.

There is other evidence also adduced on the part of the prosecution; among other things, the dying declaration of the deceased. It is proved by Mr. Wyatt, that she stated to him that the prisoner gave her a white powder in some wine on Saturday; that she wanted some wine and water; that he turned his back to her, took from his vest pocket a white powder and put into it; that she asked him what it was he had put in, and he said it was flour.

These occurrences are relied on by the prosecution to show that arsenic was administered to the deceased by the prisoner; and it is claimed that here is a train of circumstances all tending to one conclusion; that he continued to administer to her, from time to time, some white powder, not only not authorized by the physician, but against his positive directions; and that in two of these cases the powder was preserved, analyzed and found to be arsenic.

But there is another branch of evidence bearing strongly on this point. I allude to the dying declarations of the deceased. This evidence was not admitted without time for examination and reflection; because it is evidence of great importance, and should not be resorted to unless clearly admissible, more especially in a case of this moment. In this case it is proved that the deceased was very ill, suffering indeed under great torture. Wyatt, her brother, applied to the physicians, that he might understand the true state of her case. The proof is they told him she could not live; that Wyatt communicated that to his sister, and that after this communication the deceased, believing she was about to die, requested and had an interview with Dr. Hull, to whom she made the statements that are familiar to you. That subsequently Barzaleel Streeter was called in, and a similar statement was made by her to him, and afterwards to Mr. Wyatt. These declarations are proved by these three witnesses; and if made under the circumstances claimed, after she was informed and when she believed that she could not live,

then they become evidence in the case; because, if living, in a case of that character, she could be a witness to testify to the facts to convict him of an attempt to poison. But having died under the effects of poison, the law still permits her to be a witness in this way—by showing her dying declarations made under a deep sense of her situation, and when it is to be believed she spoke the truth. Now on the dying declarations, as well as on the other circumstances alluded to, the prosecution relies to satisfy you that she was poisoned by the prisoner at the bar.

Without going minutely into these declarations, they were substantially these: That the prisoner advised her to take pills on Friday; that she took them unwillingly, not believing she was in a situation to require them. That soon after she was seized, with these violent symptoms, vomiting, distress, a burning sensation in the stomach. She stated her continued suffering, from that time down to the period when these declarations were made; and further that in all the medicine that Henry (the prisoner) had given her since, there was mingled a white powder; sometimes in wine, again in soup, again in the crust coffee, and on the other occasions mentioned. These are generally her statements, and they are introduced on the part of the prosecution to show that it was the prisoner that administered to her this white substance, and which caused her death. This is competent evidence. If you are satisfied that these declarations were made under a sense that she was about to die, they are entitled to great weight as testimony. And it is for you to give them such weight as you may deem them entitled to, contrasting them with other proof in the case, and seeing if they are sustained by that evidence.

It is further urged by the prosecution that they have proved an evident intention throughout, on the part of the prisoner, to poison his wife. And it is argued that there could have been no accident or mistake on his part, in this continued administration of poison, as is claimed, in her food, as well as in her drinks, and that there are other circumstances going to show a deliberate design throughout, and such as exclude all possibility of accident or absence of design on the part of the prisoner.

. It is proved that he called on Dr. Rhodes on Friday morning to get pills, and stated to Dr. R. that he wanted them for himself; and it is claimed that this declaration of the prisoner was a concealment and a falsehood, going to show a dishonest motive in obtaining the pills. It is claimed also that what took place between Wyatt, the brother of the deceased, and the prisoner, in regard to the condition of his sister, on Saturday afternoon, shows that he was governed by design in what he did—that he told Wyatt that she was asleep and better, when it is claimed to have been proved that she was in fact worse. And it is urged that he made that communication to lull him into a false security; and that after his wife's death the prisoner declined to order a coffin, and it is claimed that his general conduct throughout the sickness of his wife was not such as evinced affection or a desire to effect her recovery.

Without commenting on all the evidence bearing on this point (and there is evidence on both sides), it is enough for me to say, that you must look carefully at the whole history of the case, as detailed in the evidence, and say whether there did seem to be that anxiety and care on the part of the prisoner, which a husband would naturally exhibit in such a case. Two witnesses have been produced on the part of the defence, who state that on one occasion, he spoke of her as being very ill and cried; and that in one case, after her death, he interfered to arrange her hair. On the part of the prosecution, they rely on other witnesses who were present at this time, more or less by the bedside of the sick woman, and it is claimed to have been shown that on the part of the prisoner, there was a marked absence of that care and anxiety which is expected in cases where there exists this relation of husband and wife, and which are always found where honesty of motive and sincere affection really exist. You must judge, from all the evidence before you (giving the prisoner in all eases the benefit of every reasonable doubt), whether his conduct was consistent with the relation in which he stood with the deceased.

Before you can convict the prisoner at the bar, you must be satisfied not only that this woman was murdered by poison, but

that the prisoner administered it to her, with the design to take her life. This is indispensable to the crime of murder. It is claimed on the part of the prisoner, that no such design could have been entertained; that the relations existing between the parties forbid the supposition; and it is urged that there was no adequate motive on his part, and that none had been proved, for the commission of the offence. I think there can be no difficulty as to what the law is on this point. Your own common sense will lead you to a just conclusion. If you see one deliberately take the life of another, or if you have satisfactory evidence of the fact, doubtless there is a motive for the act. It is evident from the act itself. You see it done, under circumstances that forbid the possibility of accident. Where a murder is charged, and the evidence is wholly circumstantial, then it is always peculiarly proper to look at the motive. And in all cases, you will naturally seek for the motive. And where the proof is circumstantial, and there be doubt about the circumstances, then it becomes most important to examine into the motive. If, however, the evidence of murder by design, be direct and positive, then the guilt is established without looking further. And in all these cases a question as to the adequacy of motive almost always arises. It is claimed generally that the motive is inadequate; that it is not sufficient to induce to the commission of murder. But all this must depend on the peculiar circumstances of each case, and the peculiar character of the accused. There is no motive which, to the mind of an honest man, can be adequate to the commission of crime; and just in proportion as the mind is debased and immoral, to that extent the motive may be less which induces the criminal act. Hence there can be no one rule for all cases, as regards adequacy of motive. It must depend on the moral character of the person accused, in each case. The worse it is, the less the motive which will tempt to the commission of crime..

It is urged, and very plausibly, on the part of the prisoner, that the relation existing between him and the deceased, forbids the supposition that he could have murdered her—that they were just married—and had barely entered on that im-

The People *v.* Green.

portant and interesting relation in life, and that it could not be supposed, under the circumstances detailed, that the prisoner could, for a moment, have entertained the idea of taking the life of the young woman, whom he had so recently sworn at the altar, to love, cherish and protect.   This consideration has weight, and you are to consider carefully this and all other circumstances favorable to the prisoner, and to give them their full and due weight, comparing them at the same time with the other evidence in the case.

It is urged by the prosecution that the prisoner's acquaintance with the girl he afterwards married was of short duration; that he had known her but a few weeks; that in fact he married her a week before the time appointed.   And it is claimed that the marriage was not agreeable to other members of his family. An attempt has been made on the part of the prosecution to introduce a letter alleged to have been written by the mother to the prisoner, after his arrest, and found in his possession. That letter has been excluded.   It was improper in counsel to allude to its contents on either side.   You are to decide this case as if that letter was not in existence.   You are to exclude it, if possible, from your minds, if its contents, or any part of them, have come to your knowledge.

But it is claimed on the part of the prosecution, that they have proved that there was a bad feeling existing on the part of the mother of the prisoner, in regard to this marriage of her son.   The proof is that on the Wednesday preceding the marriage, the mother of the prisoner came to Berlin with his sister, and stopped at Mr. Streeter's tavern.   That they remained there from morning until the afternoon of that day: that the mother sent for her son (the prisoner), and that he came to Mr Streeter's; that mother and son and daughter were closeted together there; that the witness listened at the door, and then heard a remark made by the mother, casting suspicion on the character of the prisoner's wife, alleging that she understood what her character was in Troy, or something to that effect. Now, this is evidence—legitimate evidence. You are to say to what weight it is entitled.   You have a right to refer to that

as well as other circumstances, to see whether it is proved that in truth there was bad feeling on the part of the mother in relation to her son's marriage, that she regretted what had happened and disapproved of the marriage. And in corroboration of that it is urged and shown, that the mother did not call on the deceased.

It is urged by the prosecution also that this match, thus hastily and prematurely entered into, did not indicate that desirable and abiding affection which is supposed to be incompatible with the feeling that induced the commission of this crime; and that a former attachment to Miss Godfrey (the same one that went with him after his marriage on the sleigh ride) still lingered about the prisoner, and prompted him, in connection with the interview with his mother, to the commission of the act for which he is arraigned. Look at the evidence, gentlemen, and see whether this is proved. You must look at this question of motive and give it due weight; because this is all a question of fact, and belongs to the jury to decide. It is not proper that the court should express an opinion, or attempt to control you in settling it.

On the part of the prisoner it is urged, and many witnesses have been introduced to prove, that up to the time of this occurrence, the prisoner sustained a fair character. Now, in cases of doubt, this is very important evidence. If the evidence stood balanced, or nearly so, or if it admitted of doubt, it would be more satisfactory to know what had been the true character of the accused before; and he is entitled to the benefit of former good character. But if the crime be proved upon him to your satisfaction, then it is of no consequence what his character had been. You have heard, however, what the witnesses have said on this point—what was drawn out on the direct and cross-examination; and if this case be one of doubt in your minds, then you must resort to the question of character, and give to the prisoner all the benefit of his character as proved.

I have thus called your attention to the prominent issues involved in this case. In all such cases, it is the rule of law, and it is a salutary one, which has prevailed from time immemorial,

The People *v.* Green.

that if there be a reasonable doubt of the guilt of the accused, he is to have the benefit of that doubt.   But by a reasonable doubt, I do not mean a bare possibility of innocence, because that may exist in all cases.   Even where a witness comes before you and swears that he saw a murder committed, there is a possibility that he swears to an untruth.   I mean to say that if there be a conviction on your mind, from the evidence before you, that the prisoner is guilty; if in your hearts you feel that there is no reasonable question on that point, you must then find him guilty.

Throughout this whole trial it has been the intention of the court to secure the prisoner a fair trial.   In all questions of doubt as to the admissibility of evidence, the court has been governed by views favorable to the prisoner.   So with you. Where a circumstance is of a doubtful character, or doubtful in its bearing, you are to give the prisoner the benefit of the doubt.   But where a fact is established, which leads the mind necessarily to the conclusion that he is guilty, though there may be a bare possibility that he is innocent, still you must find him guilty.

In all these cases, gentlemen, there are appeals to the sympathies of the human heart—appeals which if not made by counsel, grow out of the cases themselves.   Our sympathies naturally tend in favor of prisoners arraigned for a capital offence.   In this case, no doubt, you would gladly acquit, if you could.   It is the natural tendency of the human heart.   But you must bear in mind that mercy is not an attribute that belongs to courts.   We must pass upon the law, and the facts as they exist.   We have nothing to do with sympathy in this case.   If mercy is to be extended to the prisoner, it will be extended by a different tribunal.   The executive alone can interfere.   And in this case, as in all others of great importance—in capital cases especially—it is urged that attempts have been made to operate on your minds by local appeals and prejudices, by influences other than those legitimately to be drawn from the testimony.   I have no doubt you will guard against such influences.

A high and solemn duty devolves on you. I have no doubt you will meet it as becomes yourselves, though it is the most painful act of your lives. Probably this is the first time that you have been called upon to pass upon an issue so momentous; and I trust it may be the last. You are to soar above all extraneous influences, political or local—to discard every thing foreign to the case before you. You are above it and beyond it. You have a high and holy duty to perform. You are to mete out justice with a firm and impartial hand; and under every obligation to your country, to your own consciences, and to God, to discharge your whole duty, without fear or favor. You have been told of the consequences of a wrong verdict in this case. You have nothing to do with conjectures or possibilities. You are to say, on your consciences and your oaths, whether, upon the evidence before you, the prisoner is guilty. If you discharge that duty faithfully, whatever may be the true state of the case, you can have hereafter no cause for regret. You will always be sustained by the reflection that you have faithfully acted according to the lights before you at the time; and whether you acquit the guilty or convict the innocent, your consciences will approve your conduct.

I can not close the discharge of the duty that devolves on me without urging upon you the importance of agreeing upon a verdict. The case has occupied two whole weeks. A vast deal of time and money has been expended. The case has been very fully presented. Many witnesses have been examined, and most ably has the case been argued by counsel. You see, therefore, the great importance of endeavoring to agree on a verdict. Not that I anticipate any difficulty; but in all such cases I deem it my duty to present to the jury the importance of agreeing. And I must add, that you ought not, any of you, to place your minds in that fixed position, that you can not yield to conviction, by reason and argument among yourselves; but rather cultivate a disposition to seek after, and arrive at, the truth. I have no doubt your duty will be most faithfully discharged—kindly towards the prisoner—weighing carefully the

The People *v.* Green.

ingenious and able arguments in his behalf, at the same time with a due regard to your consciences and the public interests. And whatever result you may arrive at, if you arrive at it under a full sense of duty faithfully discharged, it will be, it must be, satisfactory to all. It will be enough for you, however, to know that it is satisfactory to your own consciences.

The counsel for the prisoner asked the court to charge, that there had been no evidence to prove that the prisoner was actuated by any motive that induced him to murder his wife. The court refused so to charge, but held and charged that that was a question of fact for the jury to decide, to which decision and charge the counsel for the prisoner excepted.

The counsel for the prisoner also asked the court to charge, that they had no right to infer anything against the prisoner, in consequence of the absence of his mother and sister from the city of Troy during the trial. And that the jury had no right to infer from the evidence, that either the mother or sister, at their interview with him at Berlin, expressed any dislike to his wife, or said any thing to the prisoner against the character of his wife. The court charged as requested, on the first proposition; and as to the second proposition, charged that the jury were not authorized to make any such inference, but must look only to what was affirmatively proved, if any thing was proved, on that subject.

The counsel for the prisoner also asked the court to charge, that by the last dying declaration of the deceased, according to the testimony of Porter G. Dennison, she declared she did not know the cause of her illness, and thereby contradicted all she had previously said implicating her husband.

The court refused so to charge, but charged that the jury must ascertain what that last dying declaration was, not only from the testimony of Porter G. Dennison, but also from that of David W. Wyatt, and having ascertained what it was, it was for the jury to say whether there was a contradiction of her previous declarations implicating her husband.

The jury found the prisoner guilty, and he was sentenced to be executed, on Wednesday the tenth day of September following. He was executed in pursuance of the sentence (*a*).

(*a*) Form of a warrant of execution.

The People of the State of New York, to the Sheriff of the County of Rensselaer, Greeting;

Whereas, at a Court of Oyer and Terminer, held at the Courthouse in the city of Troy, in said county, on the nineteenth day of July, 1845, by and before Amasa J. Parker, one of the Circuit Judges of said state, presiding judge and George R. Davis, First Judge of said County, and Archibald Bull and Silas W. Waite, Judges, of the County Courts of said county, Henry G. Green, was convicted of having murdered Mary Ann Green, his wife, by poison, and was thereupon sentenced by the said Court of Oyer and Terminer to be hanged by the neck, on Wednesday, the tenth day of September next, between the hours of nine o'clock in the forenoon and three o'clock in the afternoon, until he should be dead.

Now, we do by this warrant, pursuant to the statute in such case made and provided, require and appoint that you cause the said sentence to be executed on the day and between the hours therein mentioned and at the place and in the manner prescribed by law.

Given under the hands of the undersigned, being, the Judges who constituted said Court of Oyer and Terminer, on this nineteenth day of July, 1845.

|  |  |
|---|---|
| | Amasa J. Parker, Circuit Judge. |
| | George R. Davis, First Judge, &c. |
| A. Bull, | } Judges of the |
| S. W. Waite, | } County courts. |